**ORIGINAL**

MCC:KLM:slg:2001V00146

FILED
HARRISBURG, PA
JUN 2 0 2001
MARY E. D'ANDREA, CLERK
Per _____ Deputy Clerk

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RONALD TILLMAN, : | |
|     Plaintiff : | |
| : | |
| v. : | Civil No. 1:CV-00-2041 |
| : | (Caldwell, J.) |
| DONALD ROMINE, et al., : | |
|     Defendants : | |

**DEFENDANTS' BRIEF IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT**[1]

This is a <u>Bivens</u> complaint filed by Ronald Tillman, an inmate incarcerated at USP Lewisburg who alleges deliberate indifference to the serious medical need to be free from the effects of second-hand smoke. Tillman filed his complaint against the following defendants: Warden Donald Romine, Associate Warden Tom Sniezek, Associate Warden Louis Lopez (currently at FCI Talladega), Unit Manager A. Alexander, Correctional Counselor A. Whitecavage, and Correctional Officers A. Rowe, Jr, Keith Koncir,[2] "FNU" Hamilton, D. Eichner, D. Greene, W. Sobleski, "FNU" Lutz, R. Frasch, FNU Kratzer, and W.L. Robey.[3]

---

[1] This brief is submitted on behalf of all defendants except "FNU" Winkler and Ey, who have not been served with the amended complaint.

[2] While Koncir is named as a defendant in both the original and the amended complaint, Tillman has not made any allegations against him.

[3] FNU Hagenbuch and Romeo Bone were named in the original complaint but are not named or referenced in the amended complaint and, thus, are no longer defendants.

On June 7, 2001, the defendants filed a motion for summary judgment in that they were not deliberately indifferent to Tillman. This brief is filed in support of that motion.

### Statement of Facts

During the time period relevant to this complaint, Tillman was assigned to E-Block, a modified dormitory styled unit wherein each inmate has his own four-walled cubicle. The first floor of E-block is non-smoking while smoking is permitted on the second and third floors. (R. 1, ¶2; R. 3, ¶2.) Before any inmate is moved onto the first floor of E-block, the inmate is warned that smoking is prohibited on that floor; inmates who are smokers are assigned to other housing units. (R. 3, ¶2.)

Unit Manager Alexander and Counselor Whitecavage recall Tillman complaining about inmates smoking on the first floor of E-block. (R. 1, ¶3; R. 3, ¶3.) When Alexander asked Tillman to identify the inmates who were smoking, Tillman refused to do so. Because Tillman would make only vague allegations, the problem was difficult to address. (R. 1, ¶3.)

Alexander discussed the smoking concerns with members of Tillman's Unit Team and instructed them to be vigilant about violations of the smoking policy. Alexander observed that all Unit Team members made a sincere effort to accommodate the inmates' smoking preferences and enforce smoking regulations. Nevertheless, it is a reality of prison administration that a very large

2

percentage of inmates smoke and that inmates frequently attempt to circumvent the institution's smoking policy. (R. 1, ¶3.)

Because Tillman refused to provide staff with the names of the inmates he claimed were violating the smoking policy, Alexander directed staff to conduct a "shakedown" of the entire *first floor* of E-block to determine if inmates possessed cigarettes. These floor-wide shakedowns were conducted on at least two occasions during the time period relevant to this complaint. Although possession of cigarettes, per se, is not a violation of policy, those inmates who were found to have possessed cigarettes were counseled about the institution's smoking policy and reassigned to a smoking floor. (R. 1, ¶4; R. 3, ¶3.)

As to Associate Warden Sniezek, he remembers Tillman complaining generally about smoking issues. Sniezek discussed Tillman's concerns with the Unit Manager who supervised the housing unit. Because the Unit Manager was aware of Tillman's complaints and had organized shakedowns of the first floor of E-Block to minimize abuse of the no-smoking policy on that unit, it appeared to Sniezek that the situation was being handled properly. (R. 4, ¶3.)

With regard to Warden Romine, Warden Romine remembers generally that Tillman approached him with complaints about inmates violating the non-smoking policy on the first floor of E-block. Because abuse of the institution's smoking policy is a serious

3

concern for Warden Romine and his Executive Staff, Warden Romine told Tillman that he would remind staff of the importance of enforcing the policy. In that Warden Romine was not directly involved with the day-to-day operations of the housing units with regard to cell/cubicle assignments, however, he would have directed Tillman to his Unit Team to provide information about the inmates he claimed were violating the smoking policy. (R. 5, ¶3.)

Associate Warden Lopez does not specifically remember inmate Tillman but does recall that occasionally an inmate would approach him to discuss a smoking issue. If the inmate wanted to be moved, either to a non-smoking floor or to a housing unit which allowed smoking, Lopez would direct the inmate to his Unit Team, which handled this type of housing unit assignment. Because enforcement of the smoking policy was a concern to all the Executive staff at USP Lewisburg, the importance of enforcing the policy was discussed at roll calls for Correctional Officers and Lieutenant's meetings. (R. 6, ¶3.)

As to Tillman's claim that he observed C.O. Sobleski smoking on his housing unit, Sobleskie recalls that on June 19, 2000, while assisting with the evening count on E-block, he discovered an inmate who was unconscious and unresponsive. Sobleskie called for assistance and began securing the inmate's area. As medical staff arrived, Sobleskie may have smoked a cigarette as the situation was very stressful. The inmate was

pronounced dead by Health Services Staff. Because Sobleskie was concerned with the immediate area in and around this inmate's cubicle, he was not aware of any other inmates smoking elsewhere on the housing unit. (R. 7, ¶2.)

Tillman also claims that on four occasions C.O. Rowe "observed" an inmate smoking on the first floor of E-block and did not enforce the non-smoking policy. Rowe has observed, when making rounds in the housing unit, that it is not uncommon for inmates to attempt to circumvent the institution's smoking policy and try to sneak cigarettes in unauthorized areas. There are many additional matters that Rowe is concerned about as he makes his rounds such as looking for inmates who are out of bounds on the unit, signing inmate passes, handling telephone calls, supervising inmate movement, etc. Unfortunately, Rowe cannot "observe" every inmate on the housing unit at all times. (R. 8, ¶2)

Contrary to Tillman's allegations, Rowe has not observed inmates smoking and fail to enforce the policy. Inmates have little reason to hide their smoking from other inmates but will try very hard to hide it from staff. Accordingly, Tillman may have seen inmates smoking while, at the same time, the staff did not. Nevertheless, Tillman does not allege that he brought these alleged violations of policy to Rowe's attention so that he could enforce the policy. (R. 8, ¶3.)

5

Tillman also claims that C.O. Hamilton "observed" inmates smoking in violation of the non-smoking policy. Specifically, Tillman alleges that while Hamilton was shaking down an inmate's cubicle, an inmate was smoking in another cubicle. Tillman also claims that while Hamilton and another officer were "carrying" an inmate to the Lieutenant's Office, they did not stop to enforce the smoking policy. In addition, Tillman alleges that on a few occasions inmates were smoking in "non-smoking" areas and Hamilton did nothing. (R. 9, ¶2.)

Contrary to Tillman's allegations, Hamilton did not "observe" inmates smoking and fail to enforce the policy. While Tillman may have seen inmates smoking, Hamilton did not -- with inmates trying very hard to hide it from staff. (R. 9, ¶3.)

In addition, when Hamilton is shaking down an inmate's cell or cubicle, that job has his full attention. It is likely that Hamilton would not have known that an inmate was smoking several cubicles away. Unfortunately, it is impossible to watch each and every inmate every minute. Likewise, when staff are escorting an inmate to the Lieutenant's Office, that is the task that is the most pressing at that moment. Many times, inmates are taken to the Lieutenant's Office for serious rules infractions and resist staff efforts to take them there. Although Hamilton does not remember seeing other inmates smoking, given that he was

escorting an inmate, he may have given that priority over stopping to deal with a smoking violation at that moment. (R. 9, ¶3.)

Tillman also claims that Correctional Officers Robey, Kratzer, Eichner, Lutz, and Frasch "observed" inmates smoking on the first floor of E-block and did not enforce the non-smoking policy. It is not uncommon for inmates to circumvent the institution's smoking policy and try to sneak cigarettes in unauthorized areas. (R. 11, ¶2; 12, ¶2; 13, ¶2; 14, ¶2; 15, ¶2.) Contrary to Tillman's allegations, however, these officers did not "observe" inmates smoking and fail to enforce the policy. As mentioned above, inmates have little reason to try to hide their smoking from other inmates but will try very hard to hide it from staff. Thus, Tillman may have seen inmates smoking while the officers did not. Again, Tillman does not allege that he brought these supposed violations of policy to their attention. (R. 11, ¶3; 12, ¶3; 13, ¶3; 14, ¶3; 15, ¶3.)

For instance, Robey does not recall the specific dates and times that Tillman alleges he observed inmates smoking. Had Robey observed inmates smoking in violation of the institution smoking policy, he would have confronted them. Likewise, when Eichner is conducting a "shakedown" of an inmate's cubicle, that task has his full attention and it is unlikely Eichner would know if an inmate was sneaking a cigarette elsewhere in the unit.

Regardless, it is impossible to watch each individual inmate every minute. (R. 13, ¶3.)

With regard to C.O. Greene, Tillman claims that on October 5, 2000, Greene came onto E-block twice with a cigarette. While Greene does not remember this particular day, it is true that when Greene is working another post, he may occasionally have to go into another unit for a few minutes to assist with count or deliver some item. Because Greene was not assigned to E-block, he was not immediately familiar with the non-smoking areas on that unit. When another staff member informed Greene that the first floor was a non-smoking area, he immediately discarded his cigarette. (R. 16, ¶2.)

In light of Tillman's allegations regarding smoking, it is interesting to note that on some of the days that Tillman alleges staff were not enforcing the smoking policy, he was purchasing cigarettes himself. A review of Tillman's commissary records for the period of time relevant to this complaint reveal that Tillman purchased significant quantities of cigarettes as follows: January 31, 2000, 10 packs of Newport cigarettes; February 14, 2000, 10 packs of Newports; March 6, 2000, 12 packs of Newports; April 3, 2000, 20 pack of Newports; July 3, 2000, 10 packs of Newports; August 7, 2000, 10 packs of Newports; Sept. 18, 2000, 10 packs of Newport; October 17, 2000, 30 packs of Newports and 10 packs of Marlboro cigarettes. (R. 20, ¶2; 25-37.)

8

In his complaint Tillman has not alleged any specific medical symptoms he suffered as a result of exposure to environmental tobacco smoke (ETS), commonly referred to as second hand smoke. Furthermore, there is no documentation in Tillman's medical records to support that he suffered any harm. (Chronological Medical Records from January 1997 through February 2001, R. 38-85.)

### Question Presented

Should defendants be granted summary judgment as to Tillman's deliberate indifference claim as there exists no genuine issues of material fact?

### Argument

**SUMMARY JUDGMENT MAY BE GRANTED IN FAVOR OF DEFENDANTS AS THERE ARE NO GENUINE ISSUES OF MATERIAL FACT.**

**A.  Summary Judgment Principles.**

Summary judgment is appropriate when supporting materials, such as affidavits and other documentation, show there are no material issues of fact to be resolved and the moving party is entitled to judgement as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317 (1986). In Celotex, the Court held that "Rule 56(e)... requires that the non-moving party go beyond the pleadings by [his] own affidavits, or by 'depositions, answers to interrogatories and admissions on file', designate 'specific facts showing that there is a genuine issue for trial'". Id. at 324. Additionally, an opposing party must adduce

9

more than a mere scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Celotex, 477 U.S. at 325. Further, an opposing party cannot defeat summary judgment simply by asserting that a jury might disbelieve an opponent's affidavit. Anderson, 477 U.S. at 256-257.

**B. Tillman Has Failed to Establish That the Prison Officials Were Deliberately Indifferent to His Serious Medical Need To Be Free From the Effects of Second Hand Smoke.**

The Supreme Court examined the issue of a prisoner's exposure to second-hand smoke in Helling v. McKinney, 509 U.S. 25 (1993). In Helling, the plaintiff was confined to a facility that did not have a smoking policy in effect, there were no non-smoking areas available to non-smoking inmates and the plaintiff was housed in a cell with a cellmate who smoked five packs of cigarettes per day. The Court concluded that a prisoner's Eighth Amendment claim could be based upon future harm to health, as well as present harm arising from exposure to environmental tobacco smoke ("ETS"), commonly referred to as second-hand smoke. The Court held, however, that to succeed on such a claim a prisoner must prove both an objective element -- that he was being exposed to unreasonable high levels of ETS -- and a subjective element -- that prison officials had shown deliberate indifference to his exposure.

In remanding Helling, the Court commented that with regard to the objective factor, the inmate would have to establish

10

that he was being exposed to unreasonably high ETS levels, which would be effected in that he had been moved to a new prison, no longer had a cellmate who smoked, and a new state prison policy restricted smoking to certain areas and made reasonable efforts to respect non-smokers' wishes with regard to double bunking. As to the subjective factor of deliberate indifference, the Court stated that that had to be determined in light of the prison authorities' *current* attitudes and conduct -- taking into consideration "the realities of prison administration." Helling, 509 U.S. at 36-37.

In this case, Tillman has not met the standards set forth in Helling to show that his exposure to second-hand smoke rises to the level of an Eighth Amendment violation. First, Tillman has not satisfied the objective prong that he was exposed to unreasonable levels of ETS. The Bureau of Prisons ("BOP") does have a smoking policy that is codified at 28 C.F.R. §551.160. See also Institution Supplement 1640.03 Smoking/No Smoking Areas R. 21-24. The BOP's policy prohibits smoking in all institution common areas, including those in housing units, and accommodates non-smoking preferences in cell selection.

Additionally, while Tillman was incarcerated at USP Lewisburg for over four years, Tillman alleges only sporadic exposure to second-hand smoke for just a nine month period. Unlike in Helling, Tillman alleges only that he observed inmates violating smoking prohibitions and **assumed** that staff members, sometimes

11

carrying out a variety of other duties, such as "shaking down other cells" (R. 1, ¶4; 3, ¶3; 13, ¶3.); "conducting a count" (R. 16, ¶2.); or, in one case, "carrying an inmate to the Lieutenant's Office" (R. 9, ¶3.), should have known or seen occasional smoking violations (sometimes occurring in other areas of the unit or in other cubicles) and immediately have disciplined the offending inmates.

In contrast to Tillman, the Supreme Court has recognized the "realities of prison administration." Hellman, 509 U.S. at 36-37. Staff simply cannot observe every individual inmate every minute. Inmates frequently attempt to circumvent institution smoking regulations and "sneak" cigarettes. While inmates may not be concerned that another inmate observes them breaking a rule, they will obviously try harder to avoid staff detection and possible disciplinary action.

Further, on most of the occasions when Tillman claims to have observed other inmates breaking the smoking rules, he does not allege that he made the defendant officers aware of the misconduct at the time. (R. 8, ¶3; 9, ¶3; 11, ¶3; 12, ¶3; 13, ¶3; 14, ¶3; 15 ¶3.) When questioned by the Unit Manager, Tillman *refused* to provide any information about inmates who he alleged violated the smoking policy to assist staff in enforcing the smoking rules. (R. 1, ¶3.) Thus, Tillman has no basis to complain -- let alone to allege the violation of his constitutional rights.

12

While Tillman alleges that exposure to second-hand smoke "made him sick", a review of plaintiff's medical records during the four years he was confined at USP Lewisburg fails to support his claims in the least. From January 1997 through February 2001, Tillman was seen in excess of sixty times by Health Services staff and outside consultants. Tillman's medical records reflect that Tillman has experienced a variety of common ailments but has not once averred that any problems he had were caused or aggravated by second-hand smoke. Nor do the medical records reflect that there is any correlation between second-hand smoke and his routine medical issues. See Chronological medical records for the period of January 1997 through February 2001. (R. 38-85.) (We also note that Tillman was transferred from USP Lewisburg in February 2001 and is no longer exposed to the conditions he alleges).

In short, Tillman has not and cannot prove the "objective element" of the Helling test and defendants should be granted summary judgment. See Davidson v. Coughlin, 920 F.Supp. 305, 309 (N.D.N.Y. 1996)(failure to meet either the objective or subjective prong requires dismissal).

Tillman also has failed to satisfy the "subjective factor" of the Helling test, i.e. that the prison official acted with deliberate indifference. To succeed on this claim, Tillman must establish that the correctional defendants both knew of and disregarded an excessive risk to inmate health or safety. Farmer

13

v. Brennan, 511 U.S. 825, 837 (1994); Wilson v. Seiter, 501 U.S. 294, 299 (1991)("It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. "The question ... is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health.'" Id. at 843.

In the context of a second-hand smoking case, the Helling court noted that "adoption of a smoking policy will bear heavily on the inquiry of deliberate indifference". Helling, 509 U.S. at 37; Davidson, 920 F. Supp. at 309 n.1). Here, the BOP does have a smoking policy so that inmates like Tillman are not exposed to second-hand smoke.

Admittedly, enforcing the institution's smoking policy is a constant battle with inmates frequently attempting to violate the policy. Regardless, the defendants have established their good faith efforts to enforce the policy, including the implementation of non-smoking floors and floor wide shakedowns to discover inmates violating the policy. In light of the declarations, therefore, there simply is no evidence to establish deliberate indifference on

the defendants' part and summary judgment should be granted in defendants' favor.[4]

### Conclusion

For the reasons stated above, summary judgment should be granted in favor of the defendants and against plaintiff with a certification that any appeal would be deemed frivolous, lacking in probable cause, and not taken in good faith.

Respectfully submitted,

MARTIN C. CARLSON
United States Attorney

KATE L. MERSHIMER
Assistant U.S. Attorney
SHELLEY L. GRANT
Paralegal Specialist
217 Federal Building
228 Walnut Street
P.O. Box 11754
Harrisburg, PA 17108
717-221-4482

Dated: June 19, 2001

---

[4] Tillman also seeks a petition for writ of mandamus to enforce the smoking policy. Though the federal writ of mandamus is technically abolished, the court does have the power to compel a federal officer to perform a duty under 28 U.S.C. §1361. See Arnold v. BLaST Intermediate Unit 17, 843 F.2d 122, 125 (3d Cir. 1988). Statutory mandamus, like its common-law predecessor, is "intended to provide a remedy for a plaintiff only if he has exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary duty." Heckler v. Ringer, 466 U.S. 602, 617 (1984). See Naporano Metal & Iron Co. v. Secretary of Labor, 529 F.2d 537 (3d Cir. 1976); Grant v. Hogan, 505 F.2d 1220, 1225 (3d Cir. 1974). In that Tillman was transferred to FCI Edgefield, he is no longer exposed to the conditions he complains of and mandamus does not lie.

the defendants' part and summary judgment should be granted in defendants' favor.[4]

### Conclusion

For the reasons stated above, summary judgment should be granted in favor of the defendants and against plaintiff with a certification that any appeal would be deemed frivolous, lacking in probable cause, and not taken in good faith.

>Respectfully submitted,
>
>MARTIN C. CARLSON
>United States Attorney
>
>*/s/ Kate Mershimer*
>
>KATE L. MERSHIMER
>Assistant U.S. Attorney
>SHELLEY L. GRANT
>Paralegal Specialist
>217 Federal Building
>228 Walnut Street
>P.O. Box 11754
>Harrisburg, PA 17108
>717-221-4482

Dated: June 20, 2001

---

[4] Tillman also seeks a petition for writ of mandamus to enforce the smoking policy. Though the federal writ of mandamus is technically abolished, the court does have the power to compel a federal officer to perform a duty under 28 U.S.C. §1361. See Arnold v. BLaST Intermediate Unit 17, 843 F.2d 122, 125 (3d Cir. 1988). Statutory mandamus, like its common-law predecessor, is "intended to provide a remedy for a plaintiff only if he has exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary duty." Heckler v. Ringer, 466 U.S. 602, 617 (1984). See Naporano Metal & Iron Co. v. Secretary of Labor, 529 F.2d 537 (3d Cir. 1976); Grant v. Hogan, 505 F.2d 1220, 1225 (3d Cir. 1974). In that Tillman was transferred to FCI Edgefield, he is no longer exposed to the conditions he complains of and mandamus does not lie.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

RONALD TILLMAN,
    Plaintiff

v.      Civil No. 1:CV-00-2041
    (Caldwell, J.)

DONALD ROMINE, et al.,
    Defendants

### CERTIFICATE OF SERVICE BY MAIL

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion as to be competent to serve papers.

That on June 20, 2001, she served a copy of the attached

**BRIEF IN SUPPORT OF THE DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

by placing said copy in a postpaid envelope addressed to the person hereinafter named, at the place and address stated below, which is the last known address, and by depositing said envelope and contents in the United States Mail at Harrisburg, Pennsylvania.

Addressee:

Ronald Tillman
Reg. No. 85375-071
FCI Edgefield
P.O. Box 724
Edgefield, S.C. 28824

_____
SHELLEY L. GRANT
Paralegal Specialist