● ORIGINAL ●

DMB:KLM:slg:2001V00146

FILED
HARRISBURG, PA

JUN 20 2001

MARY E. D'ANDREA, CLERK
Per _____
          Deputy Clerk

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

RONALD TILLMAN,         :
         Plaintiff       :
                         :
     v.                  :    Civil No. 1:CV-00-2041
                         :    (Caldwell, J.)
DONALD ROMINE, et al.,   :
         Defendants      :

## STATEMENT OF MATERIAL FACTS

1. Ronald Tillman, an inmate formerly incarcerated at the United States Penitentiary, Lewisburg, Pennsylvania,[1] is the plaintiff in this <u>Bivens</u> complaint.

2. The defendants are Donald Romine, Warden; Tom Sniezek, Associate Warden; Louis Lopez, Associate Warden (currently at FCI Talladega); A. Alexander, Unit Manager; A. Whitecavage, Correctional Counselor; A. Rowe, Jr; Correctional Officer; Keith Koncir, Correctional Officer; FNU Hamilton, Correctional Officer; D. Eichner, Correctional Officer; D. Greene, Correctional Officer; W. Sobleski, Correctional Officer; FNU Lutz, Correctional Officer; R. Frasch, Correctional Officer; FNU Kratzer, Correctional Officer; and W.L. Robey.[2]

---

[1] Tillman was originally from South Carolina and concurred in a transfer to the Federal Correctional Institution in Edgefield, South Carolina, in February 2001. (R. 2, ¶5.)

[2] In his amended complaint Tillman also names FNU Winkler, Correctional Officer and FNU Ey, Captain. Neither defendant has

3. During the time period relevant to this complaint, Tillman was assigned to E-block. This housing unit is a modified dormitory styled unit wherein each inmate has his own four-walled cubicle. Tillman did not have a cellmate. (R. 1, ¶2; R. 3, ¶2.)

4. Tillman was assigned to the first floor of E-block which is a non-smoking floor. Smoking is permitted on the second and third floors of E-block. (R. 1, ¶2; R. 3, ¶2.) See also Institution Supplement 1640.03, Smoking/No Smoking Areas (R. 21-24.)

5. Before any inmate is moved onto the first floor of E-block, the inmate is warned that smoking is prohibited. Inmates who are smokers are assigned to other housing unit units. (R. 3, ¶2.)

6. Defendants Alexander and Whitecavage recall Tillman complaining about inmates smoking on the first floor of E-block. (R. 1, ¶3; R. 3, ¶3.)

7. When Alexander asked Tillman to identify the inmates who were smoking, Tillman refused to do so. Because Tillman would only make vague allegations, the problem was difficult to deal with. (R. 1, ¶3.)

---

received a summons and amended complaint nor a waiver of service. In addition, FNU Hagenbuch, Correctional Officer and Romeo Bone, Correctional Officer, were named in the original complaint, but are not named or referenced in the amended complaint. As such, it is assumed Tillman has voluntarily dismissed them from this action.

8. Alexander discussed the smoking concerns with members of Tillman's Unit Team and instructed them to be vigilant about violations of the smoking policy. Alexander observed that all Unit Team members made a sincere effort to accommodate the inmate's smoking preferences and enforce smoking regulations. However, it is a reality of prison administration that a very large percentage of inmates smoke and that inmates frequently attempt to circumvent the institution's smoking policy. (R. 1, ¶3.)

9. Because Tillman refused to provide staff with the names of the inmates he claimed were violating the smoking policy, Alexander directed staff to conduct a "shakedown" of the entire first floor of E-block to determine if inmates possessed cigarettes. (R. 1, ¶4; R. 3, ¶3.)

10. These floor-wide shakedowns were conducted on at least two occasions during the time period relevant to this complaint. Possession of cigarettes, per se, is not a violation of policy, however, those inmates who were found to have possessed cigarettes were counseled about the institution's smoking policy and reassigned to a smoking floor. (R. 1, ¶4; R. 3, ¶3.)

11. As to defendant Sniezak, Tillman alleges that he went to Sniezek in March 2000, and stated that he had spoken to the Associate Warden of Custody about the "smoking problem" he perceived in the institution. (R. 4, ¶2.)

3

12. Sniezek remembers Tillman complaining generally about smoking issues. Sniezek discussed Tillman's concerns with the Unit Manager who supervises his housing unit. The Unit Manager was aware of Tillman's complaints and had organized shakedowns of the first floor of E-Block, where Tillman lived, in an effort to minimize abuse of the no-smoking policy on that unit. Therefore, it appeared to Sniezek that the situation was being handled properly. (R. 4, ¶3.)

13. With regard to Warden Romine, Tillman alleges that he went to Warden Romine in April 2000, stating that he had spoken to the Associate Warden over Programs and Custody, and with his Unit Manager about the "smoking problem" he perceived in the institution. Furthermore, Tillman alleges that Warden Romine told him that he would have a talk "with my officers" and directed Tillman to go back to his Unit Team with information about which inmates were violating the smoking policy on his unit so that those inmates could be moved. (R. 5, ¶2.)

14. Warden Romine remembers generally that Tillman approached him with complaints about inmates violating the non-smoking policy on the first floor of E-block. Because abuse of the institution's smoking policy is a serious concern for Warden Romine and his Executive Staff, Warden Romine told Tillman that he would remind staff of the importance of enforcing the policy. (R. 5, ¶3.)

4

15. Because Warden Romine is not directly involved with the day-to-day operations of the housing units with regard to cell/cubicle assignments, he would have directed Tillman to his Unit Team to provide information about the inmates he claimed were violating the smoking policy. (R. 5, ¶3.)

16. Tillman claims that he told another Associate Warden that he had spoken to defendant Lopez, "about the smoking problem throughout the institution." (R. 6, ¶2.)

17. Lopez does not specifically remember inmate Tillman. Lopez does recall that occasionally an inmate would approach him to discuss a smoking issue. If the inmate wanted to be moved, either to a non-smoking floor, or to a housing unit which allowed smoking, Lopez would direct the inmate to his Unit Team, which handled this type of housing unit assignment. (R. 6, ¶3.)

18. Because enforcement of the smoking policy was a concern to all the Executive staff at USP Lewisburg, the importance of enforcing the policy was discussed at roll calls for Correctional Officers and Lieutenant's meetings. (R. 6, ¶3.)

19. With regard to defendant Sobleski, Tillman alleges that on one occasion he observed Sobleski smoking on Tillman's housing unit when he came to the until to help with the count. (R. 7, ¶2.)

20. On the evening of June 19, 2000, defendant Sobleskie was assisting with the evening count on E-block when he discovered

5

an inmate who was unconscious and unresponsive. Sobleskie called for assistance and began securing the inmate's area. (R.7, ¶2.)

21. As medical staff arrived, Sobleskie may have smoked a cigarette, as the situation was very stressful. The inmate was pronounced dead by Health Services Staff. Because Sobleskie was concerned with the immediate area in and around this inmate's cubicle, he was not aware of any other inmates smoking elsewhere on the housing unit. (R. 7, ¶2.)

22. With regard to defendant Rowe, Tillman claims that on four occasions Rowe "observed" an inmate smoking on the first floor of E-block and did not enforce the non-smoking policy. (R. 8, ¶2.)

23. Rowe has observed, when making rounds in the housing unit, that it is not uncommon for inmates to attempt to circumvent the institution's smoking policy and try to sneak cigarettes in unauthorized areas. However, there are many other matters that Rowe is concerned about as he makes his rounds; such as, looking for inmates who are out of bounds on the unit, signing inmate passes, handling telephone calls, supervising inmate movement, etc. Unfortunately, Rowe cannot "observe" every inmate on the housing unit at all times. (R. 8, ¶2)

24. Contrary to Tillman's allegations, Rowe denies that he observed inmates smoking and did not enforce the policy. Inmates have little reason to hide their smoking from other

6

inmates, but will try very hard to hide it from staff. Accordingly, Tillman may have seen inmates smoking while, at the same time, the staff did not. However, Tillman does not allege that he brought these supposed violations of policy to Rowe's attention so that he could enforce the policy. (R. 8, ¶3.)

25. Tillman also claims that defendant Hamilton, "observed" inmates smoking in violation of the non-smoking policy. Specifically, Tillman alleges that while Hamilton was shaking down an inmate's cubicle, an inmate was smoking in another cubicle. Tillman also claims that while Hamilton and another officer were "carrying" an inmate to the Lieutenant's Office, they did not stop to enforce the smoking policy. In addition, Tillman alleges that on a few occasions inmates were smoking in "non-smoking" areas and Hamilton did nothing. (R. 9, ¶2.)

26. Contrary to Tillman's allegations, Hamilton does not "observe" inmates smoking and not enforce the policy. Inmates have little reason to try to hide their smoking from other inmates, but will try very hard to hide it from staff. Accordingly, Tillman may see the inmates smoking and Hamilton did not. However, Tillman does not allege that he brought these supposed violations of policy to Hamilton's attention or in several cases, he does not even specify where the alleged violation occurred. (R. 9, ¶3.)

27. In addition, when Hamilton is shaking down an inmate's cell or cubicle, that job has his full attention. It is

7

likely that Hamilton would not have known that an inmate was smoking several cubicles away. Unfortunately, it is impossible to watch each and every inmate every minute. (R. 9, ¶3.)

28. Likewise, when staff are escorting an inmate to the Lieutenant's Office, that is the task that is the most pressing at that moment. Many times, inmates are taken to the Lieutenant's Office for serious rules infractions and resist staff efforts to take them there. Although Hamilton does not remember seeing other inmates smoking, given that he was escorting an inmate, he may have given that priority over stopping to deal with a smoking violation at that moment. (R. 9, ¶3.)

29. Furthermore, Tillman claims that Correctional Officers Robey, Kratzer, Eichner, Lutz, and Frasch, "observed" inmates smoking on the first floor of E-block and did not enforce the non-smoking policy. (R. 11, ¶2; 12, ¶2; 13, ¶2; 14, ¶2; 15, ¶2.)

30. The correctional officers note that it is not uncommon for inmates to circumvent the institution's smoking policy and try to sneak cigarettes in unauthorized areas. (R. 11, ¶2; 12, ¶2; 13, ¶2; 14, ¶2; 15, ¶2.)

31. Contrary to Tillman's allegations, the Correctional Officers did not "observe" inmates smoking and not enforce the policy. Inmates have little reason to try to hide their smoking from other inmates, but will try very hard to hide it from staff.

8

Accordingly, Tillman may have seen inmates smoking while the Correctional officers did not. However, Tillman does not allege that he brought these supposed violations of policy to their attention. (R. 11, ¶3; 12, ¶3; 13, ¶3; 14, ¶3; 15, ¶3.)

32. Robey does not recall the specific dates and times that Tillman alleges he observed inmates smoking. Had Robey observed inmates smoking in violation of the institution smoking policy, he would have confronted them. (R. 11, ¶3.)

33. When Eichner is conducting a "shakedown" of an inmate's cubicle, that task has his full attention and it is unlikely Eichner would know if an inmate was sneaking a cigarette elsewhere in the unit. Unfortunately, it is impossible to watch each individual inmate every minute. (R. 13, ¶3.)

34. With regard to defendant Greene, Tillman claims that on October 5, 2000, Greene came onto E-block twice with a cigarette. (R. 16, ¶2.)

35. While Greene does not remember this particular day, it is true that when Greene is working another post, he may occasionally have to go into another unit for a few minutes to assist with count or deliver some item. Because Greene was not assigned to E-block, he was not immediately familiar with the non-smoking areas on that unit. When another staff member informed Greene that the first floor was a non-smoking area he immediately discarded his cigarette. (R. 16, ¶2)

9

36. Koncir is named as a defendant in both the original and amended complaint, although Tillman does not make any allegations against Koncir in the complaint. (R. 17, ¶2.)

37. Winkler and Ey are named as defendants in the amended complaint, however, neither have received service of process in this action and have not seen or reviewed a copy of the complaint. (R. 18, ¶1; R. 19, ¶1.)

38. It is interesting to note that on some of the days that Tillman alleges staff were not enforcing the smoking policy, he was purchasing cigarettes himself. A review of Tillman's commissary records for the period of time relevant to this complaint reveal that Tillman purchased significant quantities of cigarettes as follows: January 31, 2000, 10 packs of Newport cigarettes; February 14, 2000, 10 packs of Newport cigarettes; March 6, 2000, 12 packs of Newport cigarettes; April 3, 2000, 20 pack of Newport cigarettes; July 3, 2000, 10 packs of Newport cigarettes; August 7, 2000, 10 packs of Newport cigarettes; Sept. 18, 2000, 10 packs of Newport cigarettes; October 17, 2000, 30 packs of Newport cigarettes and 10 packs of Marlboro cigarettes. (R. 20, ¶2; 25-37.)

39. Tillman has not alleged any specific medical symptoms he suffered as a result of exposure to environmental tobacco smoke (ETS), commonly referred to as second hand smoke. Furthermore, there is no documentation in Tillman's medical

records to support that he suffered any harm. (Chronological Medical Records from January 1997 through February 2001, R. 38-85.)

Respectfully submitted,

MARTIN C. CARLSON
United States Attorney

*/s/ Kate Mershimer*

KATE L. MERSHIMER
Assistant U.S. Attorney
SHELLEY GRANT
Paralegal Specialist
217 Federal Building
228 Walnut Street
Post Office Box 11754
Harrisburg, PA 17108
717-221-4482

Dated: June 20, 2001

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

RONALD TILLMAN,            :
    Plaintiff      :
                   :
    v.             :    Civil No. 1:CV-00-2041
                   :    (Caldwell, J.)
DONALD ROMINE, et al.,     :
    Defendants     :

### CERTIFICATE OF SERVICE BY MAIL

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion as to be competent to serve papers.

That on June 20, 2001, she served a copy of the attached

### STATEMENT OF MATERIAL FACTS

by placing said copy in a postpaid envelope addressed to the person hereinafter named, at the place and address stated below, which is the last known address, and by depositing said envelope and contents in the United States Mail at Harrisburg, Pennsylvania.

Addressee:

Ronald Tillman
Reg. No. 85375-071
FCI Edgefield
P.O. Box 724
Edgefield, S.C.  28824

_____
SHELLEY L. GRANT
Paralegal Specialist